IN THE UNITED STATES DISTRICT COURT
FOR MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF GREY TABLET, APPLE IPHONE, VORTEX PHONE, AND T-MOBILE CELLULAR PHONE CURRENTLY LOCATED AT HSI'S EVIDENCE ROOM AT THE HSI OFFICE IN HOULTON, MAINE | Case No. 1:24-mj-00296-JCN |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Edward C. Ainsworth, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent (SA) with the U.S. Department of Homeland Security (DHS), Homeland Security Investigations (HSI), and have been since November 2010. I am currently assigned to the Houlton, Maine office. As an HSI Special Agent, I am authorized to investigate violations of the laws of the United States, and I have been involved with numerous criminal investigations involving violations of federal law, including those involving drug trafficking and related financial crimes. As an HSI

Special Agent, I have participated in numerous arrest and seizure warrants involving a variety of offenses, including violations pertaining to drug and financial crimes investigations. I have also drafted and executed numerous warrants for residences, cellular devices, and online accounts to search for and seize physical and digital evidence. Specific to cellular devices, based on my training and experience, I am familiar with how drug trafficking enterprises and individuals associated with them utilize cell phones in furtherance of such operations. to include the use of search warrants, interviews, and various electronic devices.

3. I am a law enforcement officer with authority to execute arrest and search warrants under the authority of the United States. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4. The property to be searched is a grey tablet with the word "DIALN" printed on the back, a white Apple iPhone, a blue Vortex cellular phone, and a silver T-Mobile cellular phone, hereinafter the "Devices." The Devices are currently located in the evidence room at the HSI office in Houlton, Maine.

5. The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

6.      On September 12, 2024, at approximately 1304 hours, a white vehicle was observed making entry into Canada and then backing up into the United States on the northbound side of Interstate 95 adjacent to the United States Customs and Border Protection (CBP) Port of Entry (POE) in Houlton, Maine.

7.      Officers assigned to the POE stopped the vehicle and directed it into the inspection area on the southbound side of the interstate. CBP officers inspected the white 2019 Toyota Corolla, with New York passenger plate LCE7753 and encountered one female subject, later identified as Qu'tessa T. JOHNSON (DOB 1988).

8.      During the primary inspection, Custom and Border Protection Officers (CBPO) determined that JOHNSON would be sent to secondary for further examination due to crossing the boundary line and a strong smell of marijuana emanating from the vehicle.  JOHNSON stated that she did not want her vehicle searched.

9.      A search of the vehicle revealed a freshly smoked marijuana cigarette in the center console, a bag of white powder in the glove box, a white shopping bag in the trunk containing three-gallon size zip lock bags with crystal type rocks within. Substances were removed from the vehicle and secured in an isolation case behind locked doors inside the POE.

10.     At 1326 hours, JOHNSON was placed in handcuffs and patted down for weapons and other narcotics.  The search did not find any additional contraband. The examination was completed by CBPO Veronica Sasso and witnessed by Supervisory CBPO Shawn Tash.

11. At 1342 hours, CBP placed a request to United States Border Patrol (BP) Houlton Sector for a narcotic detecting canine officer (K9). The BP K9 arrived at 1400 and searched the car and its contents. The dog positively alerted to residual odor from the vehicle and its contents, but no additional narcotics were found.

12. At 1348 hours Homeland Security Investigations (HSI) was contacted for investigative purposes and I responded to the POE.

13. At 1450 hours, I along with CBPO Matthew McPherson attempted to interview JOHNSON. JOHNSON did not waive her Miranda rights and asked to speak with an attorney. The interview was immediately terminated.

14. I reviewed the video footage of JOHNSON entering Canada and re-entering the United States. I verified the farthest position of the vehicle into Canada by walking out to the vicinity of the border and determined that the vehicle had clearly passed the international boundary markers based on the video footage.

15. Found in the suspect vehicle were three phones and a tablet. The phones were a: gold and white Apple iPhone, a blue Vortex phone, and silver T-Mobile cellphone. There was also a grey tablet located in the vehicle. All four items were seized and turned over to me.

16. When asked about the residence listed on her driver's license, JOHNSON stated that she did not live there. She further stated that she has been homeless and living out of her vehicle for an extended period of time. The state of the vehicle was consistent with someone living out of their car.

17. The suspected narcotics were field tested at the POE by CBPO Melanie Bickford and supervised by CBP Program Manager Joseph Ewings. The powder found

in the glove box tested positive for fentanyl and was weighed on an uncertified scale with a weight of 106.5 grams. The suspected narcotics found in the white shopping bag, located in the trunk, tested positive for methamphetamine, and was weighed on an uncertified scale with a weight of 1.72 kilograms.

18. Based on my experience and training and based on conversations I have had with other experienced drug agents; I know that a person may use as little as a tenth of a gram to a gram of fentanyl or methamphetamine during an ingestion event. As such, the quantities of fentanyl and methamphetamine found in JOHNSON's vehicle are consistent with an intent to distribute controlled substances rather than for personal use.

19. As part of the investigation, I obtained information regarding this vehicle's travels to Maine. I learned that JOHNSON's vehicle was captured on license plate readers (LPRs) located in the vicinity of northern Maine and traveled to northern Maine three times in the two months preceding her arrest on September 12, 2024. In each incident, she spent between 15 and 27 hours north of the LPRs.

20. I along with CBPO Bickford transported all the evidence to the evidence room located at the HSI office in Houlton, Maine. The electronic devices were already powered off when I took possession of them, except the Apple iPhone. The iPhone was placed in airplane mode, connected to a power supply, and placed in a Faraday Bag to preserve the electronic evidence.

21. The Devices are currently in the lawful possession of HSI as they were seized incident to JOHNSON's arrest.

22.     The Devices are currently in storage in the evidence room located at HSI in Houlton, Maine.  In my training and experience, I know that JOHNSON's Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of law enforcement, and that the Devices are likely able to be forensically copied and reviewed in the event that the requested search warrant for their contents is issued by this Court.

## **TECHNICAL TERMS**

23.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files;

storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic

data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable

storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and

       directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

   h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

24. Based on my training, experience, research, and speaking with an HSI Computer Forensics Agent, I know that the Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, a tablet, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

25. Further, based on the foregoing facts, I submit that there exists probable cause to believe that evidence of violations of Title 21, United States Code, Sections 846, 841 (a)(1)- Conspiracy to Distribute and Possess with Intent to Distribute and Possession with Intent to Distribute Controlled Substances is contained within the Devices.

26.     As detailed above, the Devices were recovered in the vehicle belonging to JOHNSON. Also contained in that vehicle were substances which were field tested positive as fentanyl and methamphetamine. I know from my training and experience, as well as from information provided to me by other experienced federal and state drug investigators, that such narcotics distribution operations are complex and often require oversight and labor to be provided by multiple involved individuals, rather than a single individual. I also know from my training and experience, as well as from information provided to me by other experienced federal and state drug investigators, that it is common for those involved in drug trafficking to carry and use multiple phones or devices to aid their drug distribution activities.

27.     Therefore, the distribution operation likely required outside coordination and communication with other participants or co-conspirators, acting in concert with JOHNSON. I believe that the Devices were used to communicate with other participants or co-conspirators concerning the narcotic distribution operations and that evidence of such communications exists on the device, especially given that JOHNSON stated that she resided in her vehicle. I believe that communications from and to JOHNSON and others, concerning narcotics distribution, including via messaging, will be present on the Devices.

28.     I also know from my training and experience, as well as from information provided to me by other experienced federal and state drug investigators, that cellular telephones are often used as PDAs, similar to a personal computer. Cell phones often utilize a subscription-based data plan, which enables the user to access the Internet and GPS/directional mapping functions. It is therefore likely that the Devices had Internet

and GPS functionality. Given this likely Internet and GPS access, I believe that the evidence of illegal activity will further be present on the Devices.

29. It is also likely that geolocation data, routes, and other geographical metadata exist on the Devices, which would have been used to navigate between the rural location of Aroostook County, Maine, and other locations within and outside of Maine.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

30. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

31. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

- a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

32. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ

13

techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

33. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

34. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Edward C. Ainsworth
Special Agent
Homeland Security Invetigations

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedure

Date: Sep 27 2024

City and state: Bangor, ME

Judge's signature

John C Nivison U.S. Magistrate Judge
Printed name and title